DECIDED IN THE

## Circuit Court of the District of Columbia

FOR THE

## COUNTY OF WASHINGTON,

### MARCH TERM, 1848.

JOHN NUGENT

*vs.*

ROBERT BEALE, SERGEANT-AT-ARMS OF U. S. SENATE.

AT LAW. DECIDED MAY 11, 1848.

*Petition for Discharge on Writ of Habeas Corpus.*

1. Every Court, including the Senate and House of Representatives, is the sole judge of its own contempts; and in case of commitment for contempt, in such case, no other Court can have a right to inquire *directly* into the correctness or propriety of the commitment, or to discharge the prisoner on *habeas corpus.*

2. The warrant of commitment need not set forth the particular facts which constitute the alleged contempt.

3. The Senate of the United States has power to punish for contempts of its authority in cases of which it has jurisdiction, and an inquiry whether any person, and who, had violated the rule of the Senate which requires that all treaties laid before them should be kept secret until the Senate should take off the injunction of secrecy, is a matter within the jurisdiction of the Senate.

4. The Senate of the United States has a right to hold secret sessions whenever in its judgment the proceeding shall require secrecy, and may pronounce judgment in secret session, for a contempt which took place in secret session.

JOSEPH H. BRADLEY and J. M. CARLISLE for petitioner.

R. S. COXE for the Senate.

The petition for the writ of *habeas corpus* stated that the said John Nugent was held in custody and close confinement by Robert Beale, of the City of Washington, without any authority or warrant of law; and that the said Robert Beale has refused to exhibit to the petitioner the authority,

if any, under which he pretends to hold him, and to give him a copy thereof, and to discharge him from custody, &c.

The writ of *habeas corpus* was thereupon issued by the Court on the 3d of April, 1848, returnable on the 4th.

The return stated that " the said Robert Beale holds the office of Sergeant-at-Arms of the Senate of the United States; that the said Senate is, and has been long before the arrest of the said John Nugent, holding its regular sessions; that certain proceedings were had before the said Senate, in Executive sessions, which said proceedings are, by the rules and orders of said Senate, had in secret session, and which the respondent cannot, without violation of his official oath and duty, divulge or make public. That this respondent, as such Sergeant-at-Arms, has received from the Hon. G. M. Dallas, Vice-President of the United States and President of the Senate, a warrant, by which he is ordered and directed, authorized and required, to take into his custody the body of the said John Nugent and him safely keep according to the terms of said precept or warrant. That in obedience to the order and command of the said Senate of the United States, this respondent, as in duty bound, has arrested and now holds the body of the said John Nugent in legal custody, and now produces and exhibits to the Court now here, the said order, precept and warrant, as the cause of the caption and detention by him as aforesaid of the body of the said John Nugent, as part of this his return."

This return was accompanied by the warrant, as follows : "United States of America—

" To the Sergeant-at-Arms of the Senate of the United States; Robert Beale :

" Whereas, John Nugent, having been summoned, and having appeared at the Bar of the Senate, and having been sworn as a witness, he answered the following interrogatories :

" 1. Have you any connection with or agency for the proprietor of the newspaper published in the city of New York,

and called 'the New York Herald?' If yea, state what is that connection or agency.

" 2. Do you know that an instrument purporting to be a copy of the treaty between the U. S. of America and the Mexican Republic, with the amendments made by the Senate thereto, and the proceedings of the Senate thereon, was published in that newspaper? Declare.

" 3. Do you know by whom the copy of the instrument, with the amendments thereto, and proceedings thereon, in the last preceding interrogatory specified, was furnished to the editor, or publishers, or any agent of the editor or publishers, of the said newspaper called the New York Herald? If yea, declare and specify such person or persons.

" 4. Did you copy the parts purporting to be amendments of the treaty yourself for the purpose of sending them to the editor of the New York Herald, or for any other purpose? If you answer in the negative, then say if you know by whom they were copied.

" 5. Where, at what place or house, and at what time, were the said amendments of the treaty copied?

"And having refused to answer the following interrogatories:

" 6. Where, in what place or what house, and at what time, did you first receive a printed copy of the confidential document, containing the treaty, the President's Message, and also the other confidential documents printed in the Herald?

" 7. In answer to the 3d interrogatory, you have stated that you furnished the papers therein referred to) to the editor of the New York Herald. State from whom you received the said treaty with Mexico with the amendments and the said portion of the proceedings of the Senate.

" 8. In your answer to the 4th interrogatory, you state that the amendments there referred to were communicated to the Herald in your handwriting. Did you copy the same, and from whom did you procure the original from which you copied the same?

"9. You say in answer to the last question, that you decline to answer the same, because you cannot answer it with accuracy. State why you cannot answer it with accuracy. Is it because you do not recollect the facts inquired of?

"10. What portion of the facts do you not recollect with accuracy; is it as to the person from whom you obtained the papers, or either of them referred to?

"11. State from whom you received the treaty.

"12. State from whom you received the documents.

"13. State from whom you received the proceedings of the Senate heretofore inquired of.

"14. Was the copy of the treaty you forwarded to the Herald a printed copy?——

"——has, by so refusing, committed a contempt against the Senate; and has, by the Senate, been ordered into the custody of the Sergeant-at-Arms, there to remain until the further order of the Senate.

"These are, therefore, to authorize and require you, and you are hereby authorized and required to take into your custody, the body of the said John Nugent, and him safely keep until he answers the said interrogatories, or until the further order of the Senate of the United States in this behalf, and for so doing this shall be your sufficient warrant.

"Given under my hand this thirty-first day of March, in the year of our Lord one thousand eight hundred and forty-eight.

"G. M. DALLAS,

"Vice-President of the U. S. and President of the Senate.
Attest:

"ASBURY DICKENS,

"Secretary of the Senate of the United States."

Mr. Coxe addressed the Court and explained the cause of the prisoner's detention.

Mr. Bradley argued to show that the Court had jurisdiction in the case, entering into the doctrine of parliamentary privilege, and the jurisdiction for which he contended was

such as had been exercised in the highest judicial tribunals in England. Mr. Carlisle followed on the same side.

Mr. Coxe maintained and endeavored to show by reference to the law and usage of Parliament and the English Courts, that the Court had no jurisdiction in the case.

CRANCH, C. J., delivered the opinion of the Court:

Upon this return of the *habeas corpus* the principal questions are:

Has the Senate of the United States jurisdiction and power to punish contempts of its authority? And if so,

Whether this Court, upon this *habeas corpus*, can inquire into the question of contempt and discharge the prisoner.

The jurisdiction of the Senate in cases of contempt of its authority, depends upon the same grounds and reasons upon which the acknowledged jurisdiction of other judicial tribunals rests, to wit: the necessity of such a jurisdiction to enable the Senate to exercise its high constitutional functions —a necessity at least equal to that which supports the like jurisdiction which has been exercised by all judicial tribunals and legislative assemblies in this country from its first settlement, and in England from time immemorial. That the Senate of the United States may punish contempts of its authority seemed to be admitted by the prisoner's counsel, provided it be in a case within their cognizance and jurisdiction; but whether admitted or not, such is the law as laid down by the Supreme Court of the United States in Anderson *vs.* Dunn, 6 Wheat., 224, and in Kearney's Case, 7 Wheaton, 41.

Kearney's Case was a petition to the Supreme Court of the United States for a *habeas corpus* to the Marshal, D. C., to bring up the body of J. T. Kearney, who was committed by the Circuit Court, D. C., for contempt in refusing to answer a question in a criminal cause.

Mr. Justice Story, in delivering the opinion of the Court, after citing Brass Crossby's Case with approval, said (in p. 44):

" So that it is most manifest from the whole reasoning

of the Court in this case, that a writ of *habeas corpus* was not deemed a proper remedy where a party was committed for a contempt by a Court of competent jurisdiction; and that, if granted, the Court could not inquire into the sufficiency of the cause of commitment. If, therefore, we were to grant the writ in this case, it would be applying it in a manner not justified by principle or usage; and we should be bound to remand the party, unless we were prepared to abandon the whole doctrine, so reasonable, just and convenient, which has hitherto regulated this important subject."

The same law was declared by the Coutt of Common Pleas, in the year 1771, in Brass Crosby's Case, 3 Wils., 188, in which (in p. 201) Ld. Ch. J. DeGrey. said:

" Perhaps a contempt in the House of Commons, in the Chancery, in this Court, and in the Court of Durham may be very different, therfore we cannot judge of it; *but every Court must be sole judge of its own contempts.* Besides, as the Court cannot go out of the return of this writ, how can we inquire into the truth of the fact, as to the nature of the contempt? We have no means of trying whether the Lord Mayor did right or wrong."

And in p. 202, he says:

" There is a great difference between matters of privilege coming *incidentally* before the Court, and being *the point itself directly* before the Court. *The counsel at the bar have not cited one case where any Court of this Hall ever determined a matter of privilege which did not come incidentally before them."*
" But the present case differs much from those which the Court will determine; because it does not come incidentally before us, but is brought before us *directly, and is the whole point in question;* and to determine it we must supersede the judgment and determination of the House of Commons and a commitment ' in execution of that judgment.' "

Mr. Justice Gould, in the same case, p. 203, said: " I entirely concur in opinion with *my Lord Ch. J.,* that this Court hath no cognizance of contempts or breach of privilege of the House of Commons. ' THEY *are the only judges*

*of their own privileges.'* " And in page 204, he says, " when matters of privilege come *incidentally* before the Court, it is obliged to determine them to prevent a failure of justice." " The resolution of the House of Commons is an adjudication, *and every Court must judge of its own contempts.*"

Mr. Justice Blackstone, in the same case, said: "I concur in opinion that we cannot discharge the Lord Mayor. The present case is of great importance, because the liberty of the subject is materially concerned. The House of Commons is a Supreme Court, and they are judges of their own privileges and contempts, more especially with respect to their own members. Here is a member committed *in execution* by the judgment of his own House. *All* courts, by which I mean to include the two Houses of Parliament and the courts of Westminster Hall, are uncontrolled in matters of contempt. The *sole* adjudication of contempts and the punishment thereof in any manner, belongs *exclusively,* and without interfering, to *each respective Court.* Infinite confusion and disorder would follow if Courts could, *by writ of habeas corpus,* examine and determine the contempts of others. This power to commit results *from the first principles of justice;* for if they have power to decide, they ought to have power to punish; no other Court shall scan the judgment of a superior Court, or the principal seat of justice. As I said before, it would occasion the utmost confusion if every Court of this Hall should have power to examine the commitments of the other Courts of the Hall, for contempts; so that the judgment and commitment of each respective Court, as to contempts, must be final, and without control."

This case of Crosby was decided by the Court of Common Pleas in the year 1771, and, as Mr. Justice Story said, in delivering the opinion of the Supreme Court of the U. S. in Kearney's case, p. 43, *settled the law upon that point.* It must be remembered that the case of Crosby was upon *habeas corpus,* and the Court could not give relief without assailing the judgment of the House of Commons directly,

and revising that judgment; but when the judgment of contempt comes before the Court incidentally, or collaterally, its correctness may be questioned; as in cases where it is pleaded in justification, as was done in the case of Anderson *vs.* Dunn, 6 Wheat., 204.

The law, as stated by the Court in Crosby's case, was the law of the land, both in this country and in England before our revolution, and has so continued to the present time.

In the case of Stockdale *vs.* Hansard, for a libel, the defendant pleaded, in justification, an order of the House of Commons to print and publish the report of the inspectors of prisons, which contained the supposed libel. To this plea the plaintiff demurred, and assigned for causes : " That the known and established laws of the land cannot be superseded, suspended or altered by any resolution or order of the House of Commons; and that the House of Commons, in Parliament assembled, cannot by any resolution or order of themselves, create any new privilege to themselves inconsistent with the known laws of the land, and that if such power be assumed by them, there can be no reasonable security for the life, liberty, property or character of the subjects of the Realm."

The case was learnedly and elaborately argued in the year 1837, and decided in 1839, by the Court of Queen's Bench.

One of the questions raised in the argument was whether the House of Commons had the right to assume the authority to settle its own privilege, and to be the sole judge of its existence and extent.

In p. 20, the Attorney General, Campbell, said : "Another and a summary remedy might have been adopted; that the House, having confidence in the tribunals of the country, deems it expedient to refer the case to the consideration of the Court in the ordinary course of justice, *thereby* giving to the plaintiff an opportunity either of denying that the act was done under the alleged authority, or of showing that the authority has been exceeded."

In p. 22, he says, " here" (*i. e.*, upon *demurrer* to the plea of justification under the order of the House of Commons,) " the question of privilege is *directly* raised, and cannot, therefore, be inquired into by a Court of common law." And again he says, in p. 23 : " The most frequent cases in which the privilege of the Houses of Parliament has come in question directly, have been cases of *habeas corpus* on commitments by them, *and there the courts of common law have disclaimed jurisdiction.* So the question would arise *directly* if an action of trespass or false imprisonment were brought for such a commitment, and wherever it might be sought to overrule an act done by either House and justified by its authority. The present," he says, " is a case of that description." " If the complaint appears on the record to be made against an act of one of the Houses, so that the Court is called upon to say whether the privilege alleged in justification belongs to the House, or is usurped, the point of privilege arises *directly*, whether raised by the declaration or by any subsequent pleading." " With a question of privilege, raised *incidentally*, the Court must deal as it best can." " In such a case necessity may require that the existence of the privilege should be examined into ; but the necessity which makes the rule points out its limit. Where an act of either House is complained of, no such necessity can exist. Here an adjudication has been made on the very point, and by a Court of exclusive jurisdiction ; and such an adjudication is binding."

So much of the argument of the Attorney General in the case of Stockdale *vs.* Hansard seemed necessary to be stated that the opinion of Ld. Ch. J. Denman might be understood. The Attorney General contended, 1st, that when the question of privilege came *directly* before the Court, it could not inquire into it; and, 2d, that in the case then before him, it did come directly in question.

In support of the first proposition he cited the following cases, all of which were cases of *habeas corpus :*

1. Sir Robt. Pye's case, cited in 5 How. St. Tr., 948.

2. Lord Shaftesbury's case, 6 How. St. Tr., 1269, S. C.; 1 Mod., 144; 3 Keb., 792, in which Sir Thos. Jones, Justice, said: "The cases where the Courts of Westminster Hall have taken cognizance of privilege differ from this case; for in those it was only an *incident* to a case before them which was of their cognizance; the *direct point* of the matter now is the judgment of the Lords. This Court can neither bail nor discharge the Earl."

Wylde, Rainsford and Twisden, Justices, concurred.

3. Captain Streater's case, 5 How. St. Tr., 366.

4. The Protector and Captain Streater, Style 415.

5. Regina *vs.* Paty, 2 Lord Raymond, 1105, in which *eleven* of the twelve judges agreed that the Court of Queen's Bench had no jurisdiction in the case of Parliamentary commitment, and could not discharge the prisoners. But in that case,

Holt, Ch. J., who was the dissenting judge, said, in p. 1114, "as to what was said that the House of Commons are judges of their own privileges, *that they are so when it comes before them.* And as to the instances cited, where the judges have been cautious in giving any answer in Parliament in matters of privilege of Parliament, he said the reason of that was because the members knew probably their own privilege better than the judges, but when a matter of privilege *comes in question in Westminster Hall,* the Judges must determine it, as they did in Bynion's case.

6. Alexander Murray's case, decided in B. R., *anno* 1751, 1 Wilson, 299, upon *habeas corpus,* in which Wright, J., said: "The House of Commons is undoubtedly an high Court, and it is agreed, on all hands, that they have power to judge of their own privileges; it need not appear *to us* what the contempt was, for if it did appear we could not judge thereof." Dennison, J., added: "This Court has no jurisdiction in the present case. We granted the *habeas corpus,* not knowing what the commitment was; but now it appears to be for a contempt of the privileges of the House of Commons. What those privileges (of either

House) are, we do not know, nor need they tell us what the contempt was, because we cannot judge of it."

7. Brass Crosby's case, 2 W. Bl., 754, upon *habeas corpus*, in which the counsel of the prisoner contended that the offence stated in the warrant of commitment was no contempt; and that that Court had a right to judge of the privileges of the House of Commons; and was often obliged to take notice of them *incidentally*, as in Mr. Wilkes' Case. *But the Court* said, " they never discharge persons committed for contempt by any Supreme Court. That the law intrusted to these the power of judging of their own contempts."

8. In the case of Alderman Oliver, 2 W. Bl., 758, which was the same in its circumstances with that of Lord Mayor Crosby; a *habeas corpus* was sued out in the Court of Exchequer, and a like judgment was given by the unanimous opinion of the Barons.

9. In Rex *vs.* Fowler, 8 T. R., 314, Lord Kenyon said: " We were bound to grant this *habeas corpus;* but having seen the return we are bound to remand the defendant to prison because the subject belongs *ad aliud examen;*" and Gross, J., said: " That the adjudication of the House on a contempt was a conviction, and the commitment in consequence, execution; that every Court must be sole judge of its own contempts; and that no case appeared in which any Court of Westminster Hall ever determined a matter of privilege which did not come *incidentally* before them."

10. In Rex *vs.* Hobhouse, 2 Chit. Rep., 207, the commitment was by the House of Commons for a contempt in publishing a libel. The Court said: " The cases of Lord Shaftesbury and Rex *vs.* Paty are decisive authorities to show that the Courts of Westminster Hall cannot judge of any law, custom or usage, and consequently that they cannot discharge a person committed for a contempt of Parliament. *The power of commitment for contempt is incident to every court of justice; and more especially it belongs to the high court of Par-*

*liament;* and, therefore, it is incompetent for this Court either to question the privileges of the House of Commons, or a commitment for an offence which they have adjudged to be a contempt of those privileges.

11. In Burdett *vs.* Colman, in 14 East., 163, *the action was for false imprisonment,* and the defendant, an officer of the House of Commons, pleaded the order of the House in justification and was acquitted. The case was taken up to the House of Lords, where it was held that the complaint was answered *and that the warrant of commitment would have sufficed on a return to a habeas corpus.*

12. In the case of Stockdale *vs.* Hansard, 9 Adolphus & Ellis, 1, 36 Com. L. Rep., 74, Ch. J. Denman said: "But as to these proceedings by *habeas corpus,* it may be enough to say that the present is not of that class; and that when any such may come before us, we will deal with it as in our judgment the law may appear to require."

Again, in the same case, p. 79, 36 Com. L. Rep., Ch. J. Denman says: "But even supposing this Court would be bound to remand a prisoner committed by the House for a contempt, however insufficient the cause set out in the return, that could only be in consequence of the House having jurisdiction to *decide upon contempts.* In this case we are not trying the right of a subject *to be set free from imprisonment for contempt,* but whether the order of the House of Commons is of *power* to protect a wrongdoer *against making reparation* to the injured man."

Again, Ch. J. Denman, (in p. 82,) in the same case, said: "The other concession" (of the Attorney General) "to which I allude, is, that when matter of privilege comes before the Courts, *not directly, but incidentally,* they may, because they must, decide it. Otherwise, said the Attorney General, there must be a failure of justice. And such has been the opinion even of those judges who have spoken with the most profound veneration of privilege. The rule is difficult of application."

In the same case (Stockdale *vs.* Hansard, p. 93, 36 C. L.

Rep.), Littledale, J., says: " But it is said that the question
of the privilege of the House of Commons comes *directly* be-
fore the Court upon the pleadings ; and that therefore, *upon
all authorities*, it is quite clear it is not competent to this
Court to inquire into the question of privilege; and it is
said that it is in effect the same case in principle as Burdett
*vs.* Abbot, 14 East, 1, and that it was there held that the
defence, being founded on the order of the House to do the
thing complained of, raised the question of privilege *directly;*
and that the Court could not investigate the legality of that
order.   But this differs very materially from Burdett *vs.*
Abbott.   That was an *action* against the speaker himself for
an act done by him in the House.   The act done by him
was to commit an individual whom the House adjudged to
be *guilty of a contempt to the House,* and who had been, for
that, ordered to be taken into custody; and there was a
specific order of the House as to the particular thing to be
done; but this case is altogether different; these defendants
are not members of the House, but agents employed by
them.   The plaintiff is a perfect stranger to the House.
He has been guilty of no insult or contempt of the House;
and there is no order of the House applicable to him.   He
stands, therefore, in the situation of a stranger to the House,
complaining of persons who are not members of the House,
but merely employed to distribute their papers.  Lord
Ellenborough, in the course of his judgment, says (14 East,
138) that independently of any precedents or recognized
practice on the subject, such a body as the House of Com-
mons must, *a priori,* be armed with a competent authority
to enforce the free and independent exercise of its own
proper functions, whatever those functions may be.   But
yet when he comes to the summoning up the points for the
consideration of the Court, and gives the first part of his
judgment, he says, first, that ' it is made out that the power
of the House of Commons to commit for contempt stands
upon the ground of reason and necessity, independent of
any positive authorities upon the subject; but it is also

made out by the evidence of usage and practice, by legislative sanction and recognition, and by the judgments of the Courts of law, in a long course of well established precedents and authorities,' 14 East, 158. I admit that it is very difficult to draw the line between the question of privilege coming *directly* before the Court; and where it comes *incidentally*, the shades of difference run into one another. The decisions and dicta of the judges who have said that the House of Commons are the only judges of their own privileges, and that the Courts of common law cannot be judges of the privileges of the House of Commons, are chiefly where the question has arisen on *commitments for contempt; upon which no doubt could ever be entertained, but that the House are the only judges of what is a contempt to their House generally, or to some individual member of it;* but no case has occurred where the courts or judges have used any expressions to show that they are concluded by the resolution of the House of Commons in a case like the present."

Again, in p. 94, 36 Com. L. R., he says " there is no doubt about the right, as exercised by the two Houses of Parliament in regard to *contempts* or insults offered to the House, either within or without their walls ;" " and as to any other thing which may appear to be necessary to carry on and conduct the great and important functions of their charge. In the case of *commitments for contempts there is no doubt but that the House is the sole judge whether it is a contempt or not;* and the Courts of common law will not inquire into it. The greatest part of these decisions and dicta, where the judges have said that the Houses of Parliament are the sole judges of their own privileges, have been where the question has arisen *upon commitments for contempt,* and as to which, as I have before remarked, *no doubt can be entertained.*

" But not only the two Houses of Parliament, but every Court in Westminster Hall, are themselves the sole judges whether it be a contempt or not, although in cases where the Court did not profess to commit for a contempt, but for some matter which by no reasonable intendment could be

considered as a contempt to the Court committing, but a ground of commitment palpably and evidently *unjust and contrary to law and natural justice,* Lord Ellenborough says, that in the case of such a commitment, if it should ever occur (but which he said he could not possibly anticipate as ever likely to occur), the Court must look at it and act upon it, *as justice may require,* from whatever Court it may profess to have proceeded."

Again, Littledale, J., in p. 102, says : " I therefore, upon the whole of this case, again point out what Lord Ellenborough very much relied upon in his judgment in Burdett *vs.* Abbot, 14 East, 158, when he said that 'it is made out that the power of the House of Commons *to commit for contempt* stands upon the ground of reason and necessity, independent of any positive authorities on the subject; but it is also made out by the evidence of usage and practice, by legislative sanction and recognition, and by the judgments of the Courts of law in a long course of well established precedents and authorities, but *in the case now before the Court* (Stockdale *vs.* Hansard) I think that the power of the House of Commons *to order the publication of papers containing defamatory matter,* does not stand on the ground of reason and necessity, independent of any positive authorities on the subject. And I also think that it is not made out by the evidence of usage and practice, by legislative sanction and recognition in the Courts of law in a long course of well established precedents and authorities."

In the same case (Stockdale *vs.* Hansard), p. 107, 36 Com. L. Rep., Patteson, J., said : " It is indeed quite true that the members of each House of Parliament are the sole judges whether their privileges have been violated, and whether thereby any person has been guilty of a contempt of their authority ; and *so* they must adjudicate on the extent of their privileges. All the cases respecting commitments by the House, mostly raised upon writs of *habeas corpus,* and collected in the arguments and judgments in Burdett *vs.* Abbot, 14 East, 1, establish, at the most, only these points,

that the House of Commons has power to commit for con-
tempt; and that when it has so committed any person, the
Court cannot question the propriety of such commitment,
or inquire whether the person committed had been guilty
of a contempt of the House; in the same manner as this
Court cannot entertain any such questions if the commit-
ment be by any other Court having power to commit for
contempt. In such instances there is an adjudication of a
Court of competent authority in the particular case; and
the Court which is desired to interfere, not being a Court
of error or appeal, cannot entertain the question whether
the authority has been properly exercised."

"In order to make cases of *commitment* bear upon the
*present*, some such case should be shown in which the
power of the House of Commons to commit for contempt
under any circumstances was denied, and in which this
Court had refused to enter into the question of the exist-
ence of that power. But no such case can be found, be-
cause it has always been held that the House had such
power; and the point attempted to be raised, in the cases
of commitment, has been as to the due exercise of such
power. The other cases which have been cited in argu-
ment relate generally to the privileges of individual mem-
bers, not to the power of the House itself acting as a body;
and hence, as I conceive, has arisen the distinction between
a question of privilege coming *directly* or *incidentally* before
a Court of law. It may be difficult to apply the distinction.
Yet 'it is obvious that, upon an application for a writ of
*habeas corpus* by a person committed by *the House*, the ques-
tion of the power of the House to commit, or of the due
exercise of that power, is the original and primary matter
propounded to the *Court*, and arises *directly*. Now, as soon
as it appears that the House has committed the person for a
cause within their jurisdiction, as, for instance, a contempt
*so adjudged by them to be*, the matter has passed *in rem judi-
catum*, and the Court before which the party is brought by
writ of *habeas corpus must remand him. But if an action be*

*brought* in this Court for a matter over which the Court has general jurisdiction, as, for instance, for a libel, or for an assault and imprisonment, and *the plea first declares* that the authority of the House of Commons, or its powers, are not in any way connected with the case, the question may be said to arise incidentally. The Court must give some judgment—must somehow dispose of the question. I do not, however, lay any great stress on this distinction. It seems to me that if the question arises *in the progress of a cause*, the Court must of necessity adjudicate upon it, whether it can be said, in strict propriety of language, to arise *directly or incidentally.*" ·

In the same case (Stockdale *vs.* Hansard, p. 121, 122), Coleridge, J., said: "I know it will be said that in many of the cases alluded to the question of privilege has arisen *incidentally* only, and that in such, *ex necessitate* the Courts have interfered. In what sense '*incidentally*' is here used, has been often asked, and never, as yet, satisfactorily answered. In what sense a greater necessity exists in one case than the other, has not been made out. The cases of *habeas corpus* are generally put as instances where the question arises *directly*. Let me suppose the return to state a commitment by the speaker under a resolution of the House ordering the party to capital punishment for a larceny committed; it will hardly be said that a stronger case of necessity to interfere could be supposed; and yet it must be admitted on the other hand, the question of *privilege* or *power* (between which the argument for the defendants makes no difference) would arise *directly*. A case, therefore, may be supposed in which it would be necessary to interfere, even when the so doing would be a direct adjudication upon the act of the House. It should seem, then, that some other test must be applied to ascertain in what sense it is true that the House can alone declare and adjudicate upon its own privileges."

" I venture with great diffidence to submit the view which I have taken of these embarrassing questions, not as claim-

ing the suspicious merit of novelty, but as one which will at least remove all difficulties in theory, and be found, I believe, not inconsistent with the general course of authorities. I say *general course ;* for during so long a series, carried through times so differing in political bias and between such parties as either House of Parliament on one side, and the Courts of law, individual judges or litigant suitors on the other, it would be quite idle to expect that any one uniform principle should be found to have invariably prevailed."

" In the first place I apprehend that the question of privilege arises *directly* wherever the House has adjudicated upon the very fact between the parties, and there only. Wherever *this* appears and the case *may be* one of privilege, no Court ought to inquire whether the House has adjudicated properly or not. But whether directly arising or not, a Court of law, I conceive, must take notice of the distinction between *privilege* and *power ;* and where the act has not been done *within the House* (for of no act there done, can any tribunal, in my opinion, take cognizance but the House itself) and is clearly of a nature transcending the legal limits of privilege, *it* (the Court) will proceed against the doer as a transgressor of the law."

" To apply these principles to the case in which, on the return to a *habeas corpus*, it appears that the House has committed for a contempt in the breach of its privileges, I subscribe entirely to the decisions, and I agree also with the *dicta* which, in some of them, this Court has thrown out on supposed extreme cases. In every one of these cases the House has actually adjudicated on the very point raised in the return, and the committal is in execution of its judgment. In all of them the warrant, or order, has set out that which, on the face of it either clearly is, or may be, a breach of privilege; or it has contented itself with stating the party to have been guilty of a contempt, without specifying the nature of it, or the acts constituting it. Brass Crosby's Case, 3 Wils., 188, is an instance of the former. Lord Shaftesbury's Case, 1 Mod., 144, of the latter. The differ-

ence between the two is immaterial on the present question, which is one of jurisdiction only. Although, in the case of an inferior Court over which this Court exercises a power of revision and control, even in matters directly within their cognizance, it will require to see the cause of committal, in the warrant, yet with regard to Courts of so high a dignity as the Houses of Parliament, if an adjudication be stated generally, *for a contempt, as contempts are clearly within their cognizance,* a respectful and a reasonable intendment will be made that the particular facts on which the committal in question has proceeded, warranted it in point of jurisdiction; for (that being assumed), the propriety of the adjudication would, of course, not be inquired into. But in both cases the principle of the decision is that there has been an adjudication by a court of competent jurisdiction. Thus, in the former, DeGrey, Ch. J., says: ' When the House of Commons *adjudge* anything to be a contempt, or a *breach* of privilege, their adjudication is a *conviction,* and their commitment in consequence is *Execution;* and no Court can discharge or bail a person that is in execution by the judgment of any other Court. The House of Commons, therefore, *having an authority to commit,* and that commitment being an Execution, the question is, what can this Court do? It can do nothing when a person is in execution by the judgment of a Court of competent jurisdiction. In such case this Court is not a court of appeal.' And in the latter, in which the main contest was on the *generality* of the order of the Lords, Rainsford, Ch. J., says (1 Mod., 158): ' The commitment, in this case, is not for safe custody, but he is *in execution on the judgment given by the Lords for the contempt;* and, therefore, if he be bailed he will be delivered out of execution; because for contempt *in facie curiæ,* there is no other judgment or execution.' "

" The same principle will explain and justify the observations which have been made by different judges from time to time, with regard to supposed cases, even of direct adjudication; and if it should appear that the vice alleged against

the proceeding is not of improper decision, or excess of punishment, but a total want of jurisdiction; in other words, where it is contended that either House has not acted *in the exercise of a privilege, but in the usurpation of a power*, it cannot be doubted that the same judges *who* were most cautious in refraining from interfering with privilege, properly so called, would have asserted the right of the Court to restrain the undue exercise of power. The fact of adjudication *then* has no weight, because the Court adjudging had no jurisdiction. Many such instances have been referred to in the argument. I pass over the luminous and, as I think, still unanswered judgment of Lord Holt in Regina *vs.* Paty, 2 Ld. Raym., 1012, and the judgments, &c., cited, p. 39, which is bottomed *on this principle;* but I will cite by way of illustration, the *dicta* of Lord Kenyon and Lord Ellenborough, whom I select, not only for their pre-eminent individual authority, but also because I can cite from their judgments in cases in which they were, with a firm and favorable hand, upholding the just privileges of the Commons. And it is satisfactory to see that the *distinction* was even then present to their minds."

" Ld. Kenyon, in Rex *vs.* Wright, 8 T. R., 296, after saying ' this is a proceeding of one branch of the legislature, and, therefore, we cannot inquire into it,' immediately qualifies the generality of that remark, by adding, ' I do not say that cases may not be put in which we would inquire whether or not the House of Commons were justified in any particular measure; if, for instance, they should send their serjeant-at-arms to arrest a counsel here who was arguing a case between two individuals; or to grant an injunction to stay proceedings here in a common action, undoubtedly we should pay no attention to it.' In each case here supposed there would have been a *direct* adjudication upon the very matter; and in each there would have been a claim of privilege; but the facts would have raised the preliminary question, whether privilege or not; into that inquiry Lord Kenyon would have felt himself bound to enter;

and when he had satisfied himself that there was no such privilege the fact of jurisdiction would have become immaterial."

" So, in the most learned and able argument of Holroyd, in Burdett *vs.* Abbot, 14 East, 128, when he had put a case of the Speaker issuing his warrant by the direction of the House, to put a man to death, Ld. Ellenborough interposed thus : ' The question in all cases would be whether the House of Commons were a court of competent jurisdiction for the purpose of issuing a warrant to do the act. You are putting an extravagant case. It is not pretended that the exercise of a general jurisdiction is any part of their privileges. Where that case occurs (which it never will) the question would be whether they had general jurisdiction to issue such an order ; and no doubt the courts of justice would do their duty.' This case again supposes an adjudication ; but can *language* be more clear to show the undoubting opinion of that great judge that it would have been still open to this Court to inquire into the jurisdiction of the House. And can any one seriously believe that the fact of a previous declaration, by the House, that they had such jurisdiction, would have been considered by him as shutting up that inquiry ?"

"Again the same principle relieves me from all difficulty as to cases, where, at first sight, the question appears to arise directly, but where, still, the court of law would have to determine the case before it upon facts already directly adjudicated upon by the House. Such was the celebrated case of Burdett *vs.* Abbot, 14 East, 1, in the decision of which I most heartily concur. There the action was *trespass quare clausam fregit* and assault and false imprisonment ; but the defence was a procedure in execution of a sentence of the House of Commons. If that sentence were pronounced by a competent court, it warranted all that was done. The only question that could be made upon any principle of law, was the competency of the adjudicating Court ; and the competency of the House *to commit for a contempt* being not

seriously doubted, there was a direct adjudication, into the propriety of which this Court would not inquire. It could not inquire into it *without trying over again what has already been decided in the House, i. e.,* whether Sir Francis Burdett had been guilty of the contempt; *but this would have been contrary to the plainest principles of law.*"

In the case of the Sheriff of Middlesex, Hillary Term, 1840, 11th Adolphus & Ellis, 273, 39 C. L. R., 80, a motion was made in B. R. for a *habeas corpus* to the serjeant-at-arms of the House of Commons to bring up the bodies of Wm. Evans, Esq., and John Wheelton, Esq., with the day and cause of their being taken and detained, &c. The writ was issued, and the serjeant-at-arms returned that he took and still detains the said Wm. Evans and John Wheelton by virtue of the following warrant under the hand of the Speaker of the House of Commons.—*Martis* 21'o. *die Januarii,* 1840.

" Whereas the House of Commons have this day *resolved* that Wm. Evans, Esq., and John Wheelton, Esq., Sheriff of Middlesex, having been guilty of a contempt and breach of the privileges of this House, be committed to the custody of the serjeant-at-arms attending this House,

" These are therefore to require you to take into your custody the bodies of the said William Evans and John Wheelton, and them safely keep during the pleasure of this House; for which this shall be your sufficient warrant.

" Given under my hand, the 21st day of January, 1840.

" CHARLES SHAW LEFEVRE, *Speaker.*

" To the Sergeant-at-arms attending the House of Commons."

The return being filed, the counsel for the prisoner contended that the return was bad on these grounds :

First. That there was in fact no legal cause for the commitment; *that the Court may inquire into this,* by the Statute of 56 G. 3, c. 100, which enacts, " that where any person shall be confined or restrained of his or her liberty (otherwise than for some criminal or supposed criminal matter,

and except persons imprisoned for debt or by process in any civil suit), a judge shall, on proper complaint, award a *habeas corpus,* and that, in all cases provided for by the act, although the return to the *habeas corpus* be sufficient in law, it shall be lawful for the judge before whom it is returnable, to examine into the truth of the facts therein set forth, *by affidavit or by affirmation,* &c., and to do therein as to justice shall appertain."

And the counsel for the prisoners contended that "if the Court may inquire into the truth of the facts, it is shown here, on affidavit, that the sheriff is committed for having acted in the lawful execution of process, and that the proceeding of the House of Commons is in opposition to the judgment delivered in Stockdale *vs.* Hansard, 9 Adolphus & Ellis, 1, 36 E. C. L. R., 13, which, until reversed on appeal, is the law of the land.

Secondly (in p. 84), the counsel of the prisoners contended that "the return is bad *because it does not state the facts on which the contempt arises,*" and they said (p. 84) "there are only three precedents of Parliamentary commitments which have been supported, where no grounds were set forth." "The first is in Streater's case, 5 How. St. Tr., 365, which from the absurdity of the reasons by which the commitment was upheld, cannot be considered of any weight. The next occurs in the Earl of Shaftesbury's case, 4 How. St. Tr., 1269, S. C. 1 Mod., 144, which was decided in bad times, and is not a precedent by which any subsequent decision can be supported. The proceedings of the House of Lords against the Earl were by the House itself declared unparliamentary, and ordered to be vacated in the Journals, that they might never be drawn into precedent, 6 How. St. Tr., 1310." "The third instance, and the only one since the Revolution, was in Alexander Murray's case, 1 Wils., 299. There, indeed, two of the judges, one of whom relied on the case of Lord Shaftesbury, said that 'if the contempt had been specified, this Court could not judge of it;' but the third, Foster, J., appears to have relied upon the cir-

cumstance of the contempt being committed in the face of the House; and the particular point now in question does not seem to have been taken at the bar. In more modern cases the grounds from which the contempt was deduced have always been stated. It was so in Brass Crosby's Case, 2 W. Bl., 754, S. C. 3 Wills., 188, though DeGrey, Ch. J., said there, as appears from 3 Wils., 203, that a return stating the breach of privilege generally would be sufficient; but he seems to ground that opinion entirely on the Earl of Shaftesbury's case. In Rex *vs.* Flower, 8 T. R., 314, the warrant was special; so were those in Sir Francis Burdett's case, 14 East, 1. Lord Ellenborough there intimated that a commitment stated to be for a contempt of either House, *generally,* would be sufficient; but the opinion is thrown out *obiter,* and he seems to consider Lord Shaftesbury's case an authority for such a form. In the case of Burdett *vs.* Abbot, 5 Dow., 165, 199, in the House of Lords, Ld. Eldon put it to the judges 'whether, if the Court of Common Pleas, having adjudged an act to be a contempt of Court, had committed, for the contempt, under a warrant stating such adjudication generally, and the matter came before the King's Bench on return to a *habeas corpus,* setting forth the warrant, that Court would discharge because the particular facts and circumstances of the contempt were not set forth,' and the judges answered in the negative. But, in the case supposed, the Common Pleas would be a Court of record, acting according to the known course of the common law; the House of Commons is not such a Court, or so acting; and the Common Pleas, in the case supposed, would be punishing for a contempt *of Court.* The House of Commons here professes only to commit for a contempt of the privileges of that House, without showing what are the privileges which are supposed to be infringed. If the House may declare its own privilege as the common law Courts declare that law, it should, at least, when it punishes for a breach of privilege, point out the privilege violated, so that the law on that subject may be known in future."

"In the judgment of Vaughan, Ch. J., in Bushell's case, Vaughan, 135, 137, it is said, that the writ of *habeas corpus* commands the day and the cause of the caption and detaining of the prisoner to be certified upon the *return*, which if not done the Court cannot possibly judge whether the cause of the commitment and detainer be according to law or against it. Therefore the cause of the imprisonment ought, by the return, to appear as specifically and certainly to the judges of the return as it did to the Court or person authorized to commit, else the return is insufficient. The House of Commons, then, like other jurisdictions that exercise the power of committing may be required, on *habeas corpus*, to show the particular grounds. And were it otherwise, the House of Parliament might, at any time, punish offences against the property or servants of individual members, under the name of contempts, as was done formerly. That the Court would not now suffer this practice to pass unquestioned, though the contempt might be alleged generally on a return to a *habeas corpus*, appears from several passages in the judgment of Lord Denman, Ch. J., in Stockdale *vs.* Hansard, 9 Adolphus & Ellis, 116, 124, 147, 36 E. C. L. Rep., 31."

No one appeared in support of the return.

Ld. Denman, Ch. J., said: "I think it necessary to declare that the judgment delivered by this Court last Trinity term in the case of Stockdale *vs.* Hansard, 9 Adolphus & Ellis, 1, 36 E. C. L. Rep., 13, appears to me in all respects correct. The Court decided there, that there was no power in this country above being questioned by law." And (in p. 87) he said: "The only question, upon the present return, is whether the commitment is sustained by a legal warrant." After stating and overruling some minor objections, he says (in p. 87): "The great objection remains behind—*that the facts which constitute the alleged contempt, are not shown by the warrant.* It may be admitted that words containing this kind of statement have appeared in most of the former cases; indeed there are few in which they have not."

"In Brass Crosby's (2 W. Bl., 754, S. C. 3 Wils., 188), Sir Francis Burdett's (14 East, 1), and Mr. Hobhouse's (2 Chitty Rep., 207), cases, words were used showing the nature of the contempt. In the Earl of Shaftesbury's case (6 How. St. Tr., 1269, S. C. 1 Mod., 144), the form was general; and it was held unnecessary to set out the facts upon which the contempt arose. That case is open to observation upon other grounds, but I think it has not been questioned upon this. In Regina vs. Paty, 2 Lord Raym., 1105, three of the judges adopted the doctrine of that case to the extent of holding that the Court could not inquire into the ground of the commitment, even when expressed in the warrant. Holt, Ch. J., differed from them on that point; but he did not question that where the warrant omitted to state facts, the cause could not be inquired into. In Murray's case 1, Wils., 299, which has been often referred to and recognized as an authority, the warrant was in a general form. There is, perhaps, no case in the books entitled to so great weight as Burdett vs. Abbot, 14 East, 1, from the learning of the counsel who argued and the judges who decided it, the frequent discussions which the subject underwent, and the diligent endeavors made to obtain the fullest information upon it. The judgment of Ld. Ellenborough there, as it bears on the *point* now before us, is remarkable. He says: "If a commitment appeared to be for a contempt of the House of Commons *generally*, I would neither in the case of that Court, or of any other of the superior Courts, inquire further; but if it did not profess to commit for contempt, but for some matter appearing upon the return which could, by no reasonable intendment, be considered as a contempt to the Court committing, but a ground of commitment palpably and evidently arbitrary, unjust and contrary to every principle of positive law, or natural justice, I say that in case of such a commitment (if it ever should occur, but which I cannot possibly anticipate as ever likely to occur), we must look at it and act upon it as justice may require, from whatever Court it may profess to have pro-

ceeded." Bayley, J., as well as Ld. Ellenborough, appears in that case to have been of opinion that if particular facts are stated in the warrant, and do not bear out the commitment, the Court should act upon the principle recognized by Ld. Holt in Regina *vs.* Paty; but that if the warrant merely state a contempt in general terms, the Court is bound by it. That rule was adopted by this Court, in Rex *vs.* Hobhouse, and in the late case of Stockdale *vs.* Hansard, 9 A. & E., 1, 36 E. C. L. Rep., 13, there was not one of us who did not express himself conformably to it. In the passages which have been cited from my own judgment in that case, as showing that if a person were committed for a contempt in trespassing upon a member's property, this Court would notice the ground of committal, I always supposed that the insufficient ground should appear by the warrant.

" The Earl of Shaftesbury's case has been dwelt upon in the argument as governing the decisions of the Courts on all subsequent occasions, but I think not correctly. There is something in the nature of the Houses themselves which carries with it the authority that has been claimed, though in the discussion of such questions the last important decision is always referred to. Instances have been pointed out in which the crown has exerted its prerogative in a manner now considered illegal, and the Courts have acquiesced; but the cases are not analogous. The Crown has no rights which it can exercise otherwise than by process of law and through amenable officers; but representative bodies must necessarily vindicate their authority by means of their own; and those means lie in the process of committal for contempt. This applies not to the Houses of Parliament only, but, as we observed in Burdett *vs.* Abbot, 14 East, 138, to the Courts of Justice which, as well as the Houses, must be liable to continual obstruction and insult if they were not intrusted with such powers. It is unnecessary to discuss the question whether each House of Parliament be or be not a Court; it is clear they cannot exercise their proper functions without the power of protecting

hemselves against interference. The test of the authority of the House of Commons in this respect, submitted by Lord Eldon to the judges in Burdett *vs.* Abbot, 5 Dow., 199, was, whether, if the Court of Common Pleas had adjudged an act to be a contempt of Court, and committed for it, stating the adjudication generally, the Court of King's Bench on a *habeas corpus* setting forth the warrant would discharge the prisoner because the facts and circumstances of the contempt were not stated. A negative answer being given, Lord Eldon, with the concurrence of Lord Erskine, (who had before been adverse to the exercise of jurisdiction,) and without a dissenting voice from the House, affirmed the judgment below. And we must presume that what any Court, much more what either House of Parliament, acting on great legal authority, takes upon it to pronounce a contempt, is so."

"It was urged that this not being a criminal matter, the Court was bound by the Stat., 56 G. 3, c. 100, to inquire into the case on affidavit. But I think the provision cited is not applicable. On the motion for a *habeas corpus* there must be an affidavit from the party applying; but the return, if it discloses a sufficient answer, puts an end to the case; and I think the production of a good warrant is a sufficient answer. Seeing that, we cannot go into the question of contempt on affidavit nor discuss the motives which may be alleged." "In the present case I am obliged to say that I find no authority under which we are entitled to discharge these gentlemen from their imprisonment."

Littledale, J., concurred, and said: "If the warrant returned be good on the face of it, we can go no further. The principal objection is that it does not sufficiently express the cause of commitment; and instances have been cited in which the nature of the contempt was specified. But the doctrine laid down in Burdett *vs.* Abbott, 14 East, 1, 5 Dow., 165, in this Court, and before the House of Lords, sufficiently authorizes the present form. If the warrant declares the grounds of adjudication, this Court, in many cases will

examine into their validity, but if it does not, we cannot go into such an inquiry. Here we must suppose that the House adjudicated with sufficient reasons, and they were the proper judges."

Williams, J., said, in p. 90 : " It was a startling admission in the argument which has been addressed to us, that for the last century and an half there have been precedents in favor of this commitment. Recognized precedents have the force of decisions by which Courts and judges individually must hold themselves bound. I do not think this Court can suffer any loss of authority by so acting in the present case; but whatever may be the consequences, we must overlook it when there is an ascertained rule of law before us. If the return, in a case like this, showed a frivolous cause of commitment, as for wearing a particular dress, I should agree in the opinion expressed by Ld. Ellenborough in Burdett *vs.* Abbott, where he distinguishes between a commitment, stating a contempt generally, and one appearing by the return to be made on grounds palpably unjust and absurd." " Then the only point in this case is whether there can be on the warrant, an adjudication, in form, of commitment for contempt, which the Court according to precedent is bound to recognize." " The only real question is whether we can interfere because the ground of commitment is not particularly stated. On this point it is sufficient to cite the judgment of De Grey, Ch. J., in Brass Crosby's case, which is referred to with approbation by Ld. Ellenborough in Burdett *vs.* Abbott, 14 East, 1, 148."

Coleridge, J., in p. 91, says : " I come to my present conclusion with great regret when I consider the circumstances; but with confidence to its justice. As to the former case of Stockdale *vs.* Hansard, 9 A. & E., 2, 36 E. C. L. Rep., 13, so far as regards the general positions there laid down, I most entirely agree in them and remain of the same opinion as when it was decided. I formed that opinion with great pains and labor and a candid attention to the arguments." " The material questions here are whether the return is not

bad for not disclosing the particular grounds of the commitment; and whether it is open to an answer by affidavit; or if it be so, whether there is any case made by the affidavits. Now, first, it is too late to contend that the generality of statement in the warrant is any solid objection. It appears by precedents that the House of Commons have been long in the habit of shaping their warrants in that manner. Their right to adjudicate in this general form in cases of contempt, is not founded on privilege, but rests upon the same grounds on which this Court or the Court of Common Pleas might commit for a contempt without stating a cause in the commitment." It is contended that affidavits may be received to explain the facts returned. But the return states simply an adjudication of contempt. There is nothing in the affidavits referred to, which controverts the fact of such an adjudication; and if the House had jurisdiction to make it, we can no more inquire, by affidavit, whether they came to a right conclusion in doing so, than we could in a case of like adjudication by the Court of Common Pleas. These gentlemen must, therefore, be remanded."

These cases and authorities, we think, show conclusively, that the Senate of the United States has power to punish for contempts of its authority, in cases of which it has jurisdiction; that every Court, including the Senate and House of Representatives, is the sole judge of its own contempts; and that in case of the commitment for contempt in such a case, no other Court can have a right to inquire *directly* into the correctness or propriety of the commitment, or to discharge the prisoner on *habeas corpus*, and that the warrant of commitment need not set forth the particular facts which constitute the alleged contempt.

There were many cases cited in the argument to show that when the question of privilege or contempt came incidentally before the Court, the Court could and must decide it; but those cases have no bearing upon this, which is a case of *habeas corpus;* where it is admitted on all hands that

the question of contempt is brought directly before the Court.

But, if upon this point, it should be thought that the majority of the judges of this Court have, (as it is suggested,) stated the principle too broadly in respect to the conclusive effect of a judgment of contempt, and if it should be deemed necessary that it should appear in the return of the *habeas corpus*, that, at the time of the supposed contempt, the Senate were acting in a matter of which they had jurisdiction—we all think it *does* sufficiently appear in the return that the Senate were, at that time, engaged in a matter within their jurisdiction, to wit, an inquiry whether any person, and who, had violated the rule of the Senate which requires that all treaties laid before them should be kept secret until the Senate should take off the injunction of secrecy. This appears by the interrogatories propounded to the witness (the prisoner,) as stated in the return, and by the recital in part of the answers of the witness to a part of those interrogatories.

But it has been contended also in argument that the power of the Senate to punish for contempts is confined to their authority over their own members.

It is true that by the Constitution, Art. I, s. 5, "each House may determine the rules of its proceeding, punish its members for disorderly behavior, and, with the concurrence of two-thirds, expel a member." But it says nothing of contempts. These were left to the operation of the common law principle, that every Court has a right to protect itself from insult and contempt, without which right of self-protection they could not discharge their high and important duties. It is not at all probable that the framers of the Constitution, by giving an express power to the Senate to punish its members for disorderly behavior, and even to expel a member, intended to deprive the Senate of that protection from insult which they knew very well belonged to and was enjoyed by both Houses of Parliament and the Legislatures of the former colonies and now States of this

Union. The provision of the Constitution may have been intended to remove a doubt whether a member of the Senate, appointed by and responsible to a State Legislature, could be guilty of a contempt to a body of which he himself was a member; or it may have been intended to apply only to such disorderly behavior as did not amount to a contempt of the House; or to remove a doubt whether the Senate had power to expel a member. But whatever may have been the intention, we think the provision does not justify an inference that their power to punish for contempts can be executed only upon members of the Senate.

On this point Mr. Justice Johnson, in delivering the opinion of the Supreme Court in the case of Anderson *vs.* Dunn, 6 Wheaton, said (in p. 225): "It is certainly true that there is no power given by the Constitution to either House to punish for contempts, except when committed by their own members; nor does the judicial or criminal power given to the United States, in any part, extend to the infliction of punishment for contempt of either House, or any one co-ordinate branch of the Government. Shall we, therefore, decide that no such power exists? It is true that such a power, if it exists, must be derived by implication, and the genius and spirit of our institutions are hostile to the exercise of implied powers. Had the faculties of man been competent to the framing of a system of government which would have left nothing to implication, it cannot be doubted, that the effort would have been made by the framers of the Constitution. But what is the fact? There is not in the whole of that admirable instrument a grant of powers which does not draw after it others not expressed but vital to their exercise; not substantive and independent, but auxiliary and subordinate. The idea is utopian that government can exist without leaving the exercise of discretion somewhere. Public security against the abuse of such discretion must rest on responsibility, and stated appeals to public approbation." And again (in p. 226), he says: "But if there is one maxim which necessarily rides over all others in the prac-

tical application of government, it is that the public functionaries must be left at liberty to exercise the powers which the people have entrusted to them. The interests and dignity of those who created them, require the exertion of the powers indispensable to the attainment of the ends of their creation; nor is a casual conflict with the rights of particular individuals any reason to be urged against the exercise of such powers." " The unreasonable murmurs of individuals against the restraints of society have a direct tendency to produce that worst of all despotisms, which makes every individual the tyrant over his neighbor's rights. That the ' safety of the people is the Supreme Law' not only comports with, but is indispensable to the exercise of those powers in their public functionaries, without which that safety cannot be guarded. On this principle it is that Courts of Justice are universally acknowledged to be vested by their very creation with power to impose silence, respect and decorum in their presence, and submission to their lawful mandates, and as a corollary to this proposition, to preserve themselves and their officers from the approach and insults of pollution." " It is true that the Courts of Justice of the United States are vested by express statute provision with power to fine and imprison for contempts; but it does not follow from this circumstance that they could not have exercised that power without the aid of the statute, or not in cases, if such should occur, to which such statute provision may not extend; on the contrary, it is a legislative assertion of this right, as incidental to a grant of judicial power, and can only be considered either as an instance of abundant caution or a legislative declaration, that the power of punishing for contempt shall not extend beyond its known and acknowledged limits of fine and imprisonment."

Again the same judge (in p. 228) says " the alternative of denying this power leads to the total annihilation of the power of the House of Representatives to guard itself from contempts, and leaves it exposed to every indignity and interruption that rudeness, caprice, or even conspiracy, may

meditate against it. This result is fraught with too much absurdity not to bring into doubt the soundness of any argument from which it is derived. That a deliberative assembly, clothed with the majesty of the people, and charged with a care of all that is dear to them, composed of the most distinguished. citizens, selected and drawn together from every quarter of a great Nation, whose deliberations are required by public opinion to be conducted under the eye of the public, and whose decisions must be clothed with all that sanctity which unlimited confidence in their wisdom and purity can inspire, that such an assembly should not possess the power to suppress rudeness or repel insult, is a supposition too wild to be suggested."

And again (at page 232), "But it is argued that the inference, if any, arising under the Constitution, is against the exercise of the powers here asserted by the House of Representatives, that the express grant of power to punish their members respectively and to expel them, by the application of a familiar maxim raises an implication against the power to punish any other than their own members. This argument proves too much, for its direct application would lead to the annihilation of almost every power of Congress. To enforce its laws upon any subject without the sanction of punishment is obviously impossible. Yet there is an express grant of power to punish in one class of cases and one only, and all the punishing power exercised by Congress in any cases, except those which relate to piracy and offences against the laws of nations, is derived from implication. Nor did the idea ever occur to anyone that the express grant in one class of cases repelled the assumption of the punishing power in any other."

"The truth is that the exercise of the powers given over their own members was of such a delicate nature that a constitutional provision became necessary to assert or communicate it. Constituted as that body is, of the delegates of confederated States, some such provision was necessary to guard against their mutual jealousy, since every proceed-

ing against a representative would indirectly affect the honor or interests of the State which sent him." " In reply to the suggestion that on this same foundation of necessity might be raised a superstructure of implied powers in the Executive and every other department, and even ministerial officer of the Government, it would be sufficient to observe, that neither analogy nor precedent would support the assertion of such a power in any other than a legislative or judicial body."

It was also contended in argument that although the Senate might hold secret sessions, they could not, in secret session, punish a man for a contempt. The Court, however, cannot perceive any reason why the Senate should not have the same power of punishing contempts in secret as in open session. In the early years of this Government the sessions of the Senate were always secret.

The Constitution of the U. S., Art. I, s. 5, requires that " each House shall keep a journal of its proceedings, and from time to time publish the same, excepting such parts as may in their judgment require secrecy." The journal cannot be kept secret unless the proceedings themselves be kept secret. Hence, each House has a right to hold secret sessions whenever in its judgment the proceedings shall require secrecy." The necessity of the power to hold secret sessions, especially of the Senate, is so obvious that no argument in its favor is required by the Court.

The Senate, besides being a branch of the Legislature, is the Executive council of the President, and stands in intimate communion with him in regard to all our foreign diplomatic relations. Nothing, therefore, can be more proper than that all Executive sessions of the Senate, and all confidential communications relating to treaties should be with closed doors and under the seal of secrecy. Hence the standing rule of the Senate (No. 38) requires that all confidential communications, made by the President of the United States to the Senate shall be, by the members thereof, kept secret; and all treaties, which may

be laid before the Senate, shall also be kept secret until the Senate shall, by their resolution, take off the injunction of secrecy.    And by the standing rule of the Senate (No. 39), " all information or remarks touching or concerning the character and qualifications of any person nominated by the President to office, shall be kept secret."    By the 40th rule of the Senate, " when acting on confidential or Executive business, the Senate shall be cleared of all persons, except the secretary, the principal or executive clerk, the serjeant-at-arms and doorkeeper and the assistant doorkeeper." By the 41st rule of the Senate, " The legislative proceedings, the executive proceedings, and the confidential legislative proceedings of the Senate shall be kept in separate and distinct books."

These rules were established under the power given to the Senate by the Constitution of the United States, Art. I, Sec. 5, " to determine the rules of its proceedings," and are, therefore, until repealed, as obligatory as if they had been inserted in the Constitution itself ; so that it is not only the privilege, but the duty of the Senate to hold its Executive sessions in secret.    No odium, therefore, can attach to the Senate from the circumstance that the judgment for contempt was pronounced in secret session, upon a transaction which took place in secret session.    It could not have been done otherwise.    The offence must be punished in secret session, or go unpunished ; leaving the Senate exposed to all sorts of insults in the discharge of their solemn constitutional duties.

After an anxious and careful consideration of the whole case, the Court is unanimously of opinion that the Senate of the United States has power, when acting in a case within its jurisdiction, to punish all contempts of its authority, and that the prisoner, having been committed by the Senate, for such a contempt, and being still held and detained for that cause, by their officer, this Court has, upon the *habeas corpus,* no jurisdiction to enquire further into the cause of commitment and must remand the prisoner.

Prisoner remanded.